**MCLETCHIE LAW**
Margaret A. McLetchie
Nevada Bar No. 10931
Leo S. Wolpert
Nevada Bar No. 12658
602 South Tenth Street
Las Vegas, NV 89101
Telephone: (702) 728-5300;
Fax: (702) 425-8220
maggie@nvlitigation.com
leo@nvlitigation.com
efile@nvlitigation.com

**SHAW LEWENZ**
Jordan A. Shaw, Esq. (*pro hac
vice* pending)
Florida Bar No. 111771
Gabriel E. Morales Esq.
(*pro hac vice* pending)
Florida Bar No. 1038778
110 S.E. 6th Street, Suite 2900
Ft. Lauderdale, FL 33301
Telephone: (954) 361-3633
Fax: (954) 989-7781

**SONN LAW GROUP PA**
Jeffrey R. Sonn, Esq.
Florida Bar No. 773514
(*pro hac vice* pending)
Brian Pastor, Esq.
Florida Bar No. 998826
19495  Biscayne  Blvd
Suite 607
Aventura, FL 33180
Telephone: 305-912-3000
Fax: 786-485-1510
Jsonn@sonnlaw.com
service@sonnlaw.com

**ADAM        A.
SCHWARTZBAUM, P.A.**
Adam A. Schwartzbaum,
Esq. (*pro hac vice* pending)
Florida Bar No. 93014
14 NE 1st Ave Suite 705
Miami, FL 33132
Telephone: 305-725-1245
adam@schwartzbaum.com
admin@schwartzbaum.com
*Attorneys for Plaintiff*

**Murphy's Law: The Crypto
Law Firm**
T. Liam Murphy, Esq. (*pro
hac vice* pending)
New York Bar No. 5853759
353 Lexington Avenue
4th Floor, Suite 400
New York, New York 10016
Telephone: 913-575-0540
liam@murphyslawcrypto.com

**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

| | |
|---|---|
| ERIC LOGWOOD, | Case No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| BANK OF AMERICA, N.A., | |
| Defendant | |

## SUMMARY OF THE ACTION[1]

1.      This is an action against Bank of America (referred to herein as "BOA") for

---

[1] The allegations in this Complaint are based upon the documents and information available to Plaintiff at the time of this filing and are subject to clarification, amendment, revision, or other modification in light of new documents and information obtained through subsequent discovery in this action, in the related Goliath Ventures bankruptcy case, or otherwise.

1

enabling a massive cryptocurrency fraudulent scheme orchestrated by Goliath Ventures LLC ("Goliath").  The scheme continued until the Department of Justice ("DOJ") arrested the Chief Executive Officer of Goliath, Christopher Delgado ("Delgado"), on February 24, 2026. Upon information and belief, the DOJ is presently pursuing a forfeiture claim against Delgado and all of his personal assets.

2.    This case arises from BOA's role in enabling and sustaining a massive Ponzi scheme that defrauded investors of hundreds of millions of dollars. This action concerns a distinct cohort of investors whose funds were transmitted to, received by, processed through, or otherwise routed via specific BOA accounts used by Goliath Ventures to solicit, receive, commingle, and deploy investor capital. The transmission of investor funds through these BOA accounts constituted a critical operational channel of the Goliath scheme and enabled the continued solicitation of new investors and the deepening of losses suffered by existing investors.

3.    Goliath Ventures was not a legitimate investment enterprise. Goliath operated as a Ponzi scheme whereby thousands of victims were solicited to invest substantial sums of money under false and fraudulent promises of monthly returns, which were sometimes presented as guaranteed or low risk, generated through cryptocurrency "liquidity pools." It was a fraudulent operation that the Department of Justice alleged raised at least $328 million from investors under the guise of cryptocurrency trading and investment, while in reality using new investor funds to pay earlier investors and to finance the personal expenditures of its principals.  The scheme bore all the hallmarks of a classic Ponzi scheme: commingled funds, circular transactions, fictitious "returns," and the absence of any genuine revenue-generating activity. From January 2023 through January 2026, investors were told by Goliath promoters through presentations and marketing materials that their funds would move from a traditional bank account in the name of Goliath to Coinbase, then to an "encrypted ledger," and ultimately into liquidity pools where returns would be generated.

4.    Critically, Goliath did not operate in a vacuum.  After being debanked by JPMorgan Chase, a decision that itself reflected serious compliance and risk concerns,

Goliath moved its banking operations to BOA. Rather than identifying and stopping the fraud, BOA became the primary financial conduit through which the scheme operated.

5. At the center of the scheme was a BOA business account ending in 9136 (the "BOA Account"), which functioned as the central hub for investor funds. From May 2025 through September 2025 alone, approximately $75 million was deposited into the BOA Account. During that same period, tens of millions of dollars were rapidly transferred out, including approximately $42 million to cryptocurrency exchange accounts and approximately $11 million to investors as purported "returns," which were in fact funded by other investors' deposits. From January 2023 to September 2025, approximately $165 million was sent to Goliath's Coinbase wallets from the JPMC 0305 account and the BOA 9136 account. From January 2023 through June 2025, approximately $123 million from the JPMC 0305 account to Goliath's wallets at Coinbase. From May 2025 through September 2025, approximately $42 million from the BOA 9136 account to Goliath's wallets at Coinbase.

6. The activity flowing through the BOA Account was not subtle. It was large-scale, highly structured, and replete with red flags. The account exhibited the defining characteristics of a Ponzi scheme, including the recycling of investor funds to create the illusion of profitability and significant transfers for personal use, including a $500,000 wire used in connection with the purchase of real property titled in the name of Goliath's principal. And, while banking at BOA, Christopher Delgado, the principal operator of Goliath Ventures, made personal expenditures of investor funds, including: a) the purchase of the real property in Winter Park, Florida, in July 2025 for approximately $3.2 million; and b) the purchase of the real property in Windermere, Florida, in September 2025 for approximately $8.5 million. BOA had a front-row seat to this misconduct. Through its monitoring systems, compliance obligations, and direct access to account activity, BOA observed, or recklessly disregarded, clear indicators of fraud. Yet it continued to maintain the account, process transactions, and provide the banking infrastructure necessary for the scheme to operate and expand.

7.      BOA's role was not passive.  Its services were indispensable.  Without access to the U.S. banking system through BOA, Goliath could not have accepted investor funds at scale, transferred those funds to cryptocurrency platforms, or perpetuated the illusion of legitimate returns.  BOA's conduct thus substantially assisted the scheme and allowed it to continue long after it should have been detected and stopped. The use of BOA accounts to receive investor funds conveyed a false appearance of institutional legitimacy that was reasonably relied upon by investors. The association with a nationally recognized financial institution materially assisted Goliath Ventures in attracting additional capital and maintaining investor confidence.

8.      Bank of America's wholesale disregard of relevant banking laws and regulations in order to enjoy the benefits of maintaining a banking relationship with Goliath and its leadership laid the foundation for the scheme's exponential growth. Bank of America, by virtue of the extensive due diligence and compliance requirements financial institutions must abide by with respect to their customers, knew, possessed all the requisite information to know, or should have known that Goliath Venture's banking operations were illegitimate and that Goliath Ventures, its principals, and other individuals Bank of America permitted to control the accounts, were conducting an illegal and fraudulent scheme, yet opted to abandon any pretense of objectivity in exchange for a lucrative relationship with known fraudsters. Bank of America's total failure to surveil and respond to Goliath Ventures' activity enabled Goliath Ventures to perpetrate their fraudulent scheme and effectuate hundreds of millions of dollars of Investors' losses.

9.      Indeed, federal regulators have descended upon Bank of America for its ineffective internal controls and inadequate due diligence and compliance programs. As disclosed on October 29, 2024, in a quarterly report filed with the United States Securities and Exchange Commission ("SEC"), Bank of America's faulty due diligence and compliance programs have been the focus of ongoing probes by "several of [Bank of America's] federal regulators."

10.     According to the cease-and-desist order issued by the Office of the

4

Comptroller of the Currency ("OCC") on December 23, 2024, attached hereto as Exhibit A (the "OCC Consent Order"), Bank of America "failed to develop and provide for the continued administration of a program reasonably designed to assure and monitor BSA compliance, resulting in a violation of 12 C.F.R. § 21.21," "has certain deficiencies in . . . components of [its] BSA Compliance Program," and "had a breakdown in its policies, procedures, and processes to identify, evaluate, and report suspicious activity, including [Bank of America's] systemic failure to ensure that its transaction monitoring system had appropriate thresholds for determining when transaction alerts should trigger a case investigation; [Bank of America's] failure to ensure sufficient resources dedicated to case investigations; and noncompliance with the SAR filing requirement, resulting in violations of 12 C.F.R. § 21.11." *See* OCC Consent Order at pgs. 2-3. As discussed in greater detail in Section II(A) herein, the OCC Consent Order requires Bank of America to prepare, implement, and adhere to a written plan (the "Action Plan") detailing the necessary remedial and corrective actions it will take to address its due diligence and compliance program deficiencies.

11.     This action seeks to hold BOA accountable for its role in enabling, facilitating, and sustaining the Goliath Ponzi scheme.  Plaintiff brings this action on behalf of themselves and a class of similarly situated investors who suffered losses as a direct result of BOA's conduct.

### **PARTIES**

12.     Plaintiff Eric Logwood ("Plaintiff") is a citizen of Nevada, an individual investor who entered into a Goliath Ventures joint venture agreement and suffered substantial financial losses as a result of the Goliath Ponzi scheme.

13.     Defendant Bank of America, N.A. ("Bank of America") is a national banking association organized under the laws of the United States, with its principal place of business in Charlotte, North Carolina.

14.     BOA is one of the largest financial institutions in the United States and provides a wide range of banking, financial, and transactional services to individuals and

businesses nationwide.

15. At all relevant times, BOA conducted substantial business throughout the United States, including within this District, and maintained and serviced bank accounts for Goliath that were used to receive, transfer, and disburse investor funds in connection with the Goliath scheme.

16. BOA, through its employees, agents, and systems, processed tens of millions of dollars in transactions through Goliath-controlled accounts, including the account ending in 9136, which served as the central operating account of the Goliath enterprise from May to September 2025.

**JURISDICTION AND VENUE**

17. This Court has jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because this action is brought as a class action, there are more than 100 members of the proposed class, at least one member of the class is a citizen of a state different from Defendant, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

18. This Court has personal jurisdiction over Defendant BOA because it conducts substantial, continuous, and systematic business within this District and throughout the United States, including maintaining branch locations, employees, and banking operations in this District.

19. BOA purposefully availed itself of the privilege of conducting business within this District by, among other things, maintaining and servicing bank accounts used in connection with the Goliath enterprise, processing transactions through those accounts, and directing banking services and communications into this District.

20. Plaintiff's claims arise out of and relate directly to BOA's contacts with this District, including its provision of banking services that enabled the receipt, transfer, and disbursement of investor funds through accounts maintained and controlled within the United States banking system.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a

6

substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendant is subject to personal jurisdiction in this District.

22. Venue is further proper because BOA regularly conducts business in this District, maintains offices and personnel in this District, and has engaged in the conduct alleged herein within this District.

23. The exercise of jurisdiction over BOA in this District comports with traditional notions of fair play and substantial justice, as BOA has deliberately engaged in significant activities within this District and could reasonably anticipate being haled into court here for claims arising from those activities.

## GENERAL ALLEGATIONS

### I.    BANK SECRECY ACT AND AML OBLIGATIONS; BOA DEFICIENCIES

24. Banks operating in the United States must comply with the Bank Secrecy Act (the "BSA"), 31 U.S.C. Section 5311, *et seq*.

25. The BSA requires financial institutions to maintain anti-money laundering programs designed to detect suspicious financial activity.

26. Implementing regulations require banks to maintain internal monitoring systems, customer due diligence procedures, and suspicious activity reporting programs. For example, 31 C.F.R. Section 1020.210 requires banks to implement anti-money laundering compliance programs. 31 C.F.R. Section 1020.210 requires banks to implement anti-money laundering compliance programs. 31 C.F.R. Section 1020.220 requires banks to maintain customer identification programs. Banks must also file Suspicious Activity Reports ("SARs") when transactions suggest possible fraud or money laundering.

27. Federal banking guidance identifies red flags including, but not limited to: (a) rapid inflows and outflows of funds; (b) commingling of funds; (c) transfers between related accounts; (d) transactions inconsistent with a customer's business model; (e) circular transfers of funds; (f) atypical Wealth Inconsistency; High-value transactions or lifestyles that are not commensurate with the customer's known income, occupation, or business line; and (d) many large, round dollar transactions.

7

28.    Banks are required to monitor these patterns and investigate suspicious activity.

29.    Federal law requires banks to "know their customers" and understand their customers' banking behavior. *See, e.g.*, 31 C.F.R. § 1020.220. According to BOA, BOA complies with these obligations. BOA must collect information about its customers when it opens an account for the customers and as they transact. Where an entity opens an account, the bank must obtain information concerning the individuals who control the account. BOA also must conduct customer due diligence to gauge the risk of fraud, money laundering, terrorist financing, or other illicit account uses. *See, e.g.*, 31 C.F.R. § 1020.210.

30.    BOA is required to understand the types of transactions in which its customers are likely to engage and remain vigilant for transactions that may be suspicious. These laws impose on BOA a duty to understand the nature and purpose of their customer relationships and develop a customer risk profile. This information must then be used for ongoing monitoring of its customers' transactions. Such duties form part of the federally mandated compliance with Anti-Money-Laundering ("AML") laws. *See* 12 C.F.R. § 21.21.

31.    When monitoring its customers' accounts, BOA is obligated to comply with the BSA, including regulations broadening its AML provisions. The BSA requires BOA to develop, administer, and maintain a program to ensure compliance. The program must be approved by the bank's board of directors and noted in the board meeting minutes. The compliance program must (1) provide for a system of internal controls to ensure ongoing BSA compliance, (2) provide for independent testing of the bank's compliance, (3) designate an individual to coordinate and monitor compliance, and (4) provide training for appropriate personnel.

32.    BOA must also maintain a customer due diligence program to predict the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means of identifying unusual or suspicious transactions for each customer. The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the

type and frequency of transactions in which its customers are likely to engage.

33. BOA knows its customer due diligence program should be tailored to the risk presented by individual customers, such that the higher the risk presented, the more attention is paid. Where a customer is determined to be high risk, banks should gather additional information about the customer and accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

34. Accordingly, BOA implements its customer identification and due diligence programs in a manner that allows it to (1) know who is in charge of each account, (2) the nature and purpose of the account and the customer's business, and (3) the anticipated transactions that will be processed through the account, together with expected volume and frequency.

35. In connection with these programs and processes, BOA has a senior bank official responsible for compliance with AML requirements. BOA also has sector, regional, and legal entity AML compliance officers responsible for coordinating and monitoring day-to-day compliance.

36. The Federal Financial Institutions Examination Council (the "FFIEC") sets standards and guidelines for banks to comply with their AML obligations. FFIEC publications describe certain "red flags" that indicate possible money laundering schemes and other misconduct requiring further inquiry. BOA and its personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering indicia set forth in the FFIEC's BSA/AML Examination Manual. These include:

    a. "Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."

    b. "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

    c. "Unusual use of trust funds in business transactions or other financial activity."

d. "Customer makes high value transactions not commensurate with the customer's known incomes."

e. "A large volume of ... funds transfers is deposited into ... an account when the nature of the accountholder's business would not appear to justify such activity."

f. "A retail business has dramatically different patterns of currency deposits from similar businesses in the same general location."

g. "Goods or services purchased by the business do not match the customer's stated line of business."

h. "Goods or services, if identified, do not match profile of company provided by respondent bank or character of the financial activity."

i. "Payments or receipts with no apparent links to legitimate contracts, goods, or services are received."

j. "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

k. "Funds transfers contain limited content and lack related party information."

l. "Funds transfers are sent or received from the same person to or from different accounts."

m. "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

n. "Multiple high-value payments or transfers between shell companies with no apparent legitimate business purpose."

o. "Purpose of shell company is unknown or unclear."

p. "Customer has established multiple accounts in various corporate or individual names that lack sufficient business purpose for the account complexities or appear to be an effort to hide the beneficial ownership from the bank."

q. "A large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers, particularly when the activity involves higher-risk locations."

r. "Customer repeatedly uses a bank or branch location that is geographically distant from the customer's home or office without sufficient business purpose."

s. "Deposits are structured through multiple branches of the same bank or by groups of people who enter a single branch at the same time."

t. "Funds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations."

u. "Funds are sent or received via international transfers from or to higher-risk locations."

37.    To comply with FFIEC guidance and AML regulations, BOA maintains systems to monitor accounts and account activity for improper activity. This includes review, monitoring, and evaluation of transactions, the transacting parties, the parties' identity, and account patterns. BOA is further expected to consult external sources, such as the internet, commercial databases, and direct inquiries to evaluate the nature of suspicious transactions and the identities of the parties to the transactions.

38.    BOA collects and maintains information about its customers and their banking behavior to, among other things, detect and prevent money laundering and fraud and to protect itself.

39.    For this purpose, BOA maintains procedures to determine the identity of each customer—31 C.F.R. §§ 1020.220(a)(1), (2)—and to collect information about the holder of each account—31 C.F.R. § 1020.220(a)(2). When an entity rather than an individual opens an account, the bank obtains information about the individual who will control the account. 31 C.F.R. § 1020.220(a)(2)(ii)(C). The information that BOA collects about new business account clients includes the purpose and nature of the business,

anticipated activity in the account (*e.g.*, volume, value (number and dollar), and type of transaction), where the customer expects to transact business, and the products and services commonly used by the customer.

40.    Based on this information, as well as external resources like internet search engines and public and commercial record databases, BOA creates an initial client profile and assigns a compliance-related risk rating. Neither the profile, nor the risk rating, is final or static. When BOA learns that customer information has materially changed, its internal controls require updating that information and, where appropriate, reassessing the customer's risk profile or rating. One of the ways in which the bank becomes aware of such changes is when the customer's transactions appear inconsistent with the bank's understanding of the nature and purpose of the account—for instance, when there are significant, unexplained changes in account activity.

41.    BOA also maintains internal controls to ensure ongoing compliance with federal AML laws and regulations. These include independent testing of the bank's compliance, regular monitoring of compliance, and training of personnel. These controls also include customer due diligence programs to prevent and detect money laundering.

42.    Through these programs, BOA obtains information that gives it an understanding of the unique financial activity of its customers. Likewise, BOA can predict the type and frequency of transactions in which its customers are likely to engage, including the dollar volume and transaction volume typical of each account. These datapoints are then used to identify unusual and suspicious transactions.

43.    BOA provides AML training to all personnel whose duties may require such knowledge, including tellers and wire room personnel, to allow them to detect money laundering and fraud. Supervising personnel then oversee the day-to-day issues and implementation of the BOA's compliance structure at its individual branches.

44.    Many branch-level employees also regularly review Balance Fluctuation Reports. These reports highlight substantial balance fluctuations and list the account activity in certain accounts.

45. Bank employees must also complete Currency Transaction Reports on any cash transactions exceeding $10,000.

46. Here, BOA conducted due diligence and engaged in a Know Your Customer analysis of Goliath and Delgado and monitored Goliath's accounts for anomalous or suspicious behavior. BOA collected and reviewed information about Goliath's business operations, the source of their funds, and the purpose of their accounts. In doing so, it formed expectations about the proper use of the Goliath accounts.

47. Further, BOA knows what its employees know. In other words, the knowledge of its employees is imputed to BOA.

48. BOA knew that Delgado was president, CEO, and manager of Goliath and owed fiduciary duties to Goliath and Goliath's partners.

49. Upon information and belief, prior to maintaining the Goliath accounts at BOA, Goliath had been debanked by JPMorgan Chase due to suspicious or high-risk activity. Such termination by a major financial institution constituted a significant risk indicator that required heightened scrutiny under BOA's anti-money laundering and customer due diligence obligations.

50. Consistent with industry practice and its own compliance procedures, BOA was required to assess whether a prospective or existing customer had previously been terminated by another financial institution and, if so, to determine the reasons for such termination. This includes consulting internal databases, external reporting systems, and other sources of information reasonably available to the bank.

51. Had BOA conducted appropriate due diligence consistent with its obligations under the BSA and applicable regulatory guidance, it would have discovered that Goliath presented elevated risk characteristics, including prior banking relationship terminations and transaction patterns indicative of potential fraud.

52. The fact that Goliath was able to migrate its banking operations to BOA following its debanking elsewhere did not eliminate these risks. To the contrary, it heightened BOA's obligation to conduct enhanced due diligence, closely monitor account

13

activity, and promptly investigate suspicious transaction patterns.

53.    Instead, BOA ignored or recklessly disregarded these heightened risk indicators and proceeded to provide Goliath with full access to the U.S. banking system, including the ability to receive, transfer, and disburse tens of millions of dollars in investor funds through its accounts.

54.    BOA did not onboard Goliath in a vacuum.  It stepped into a banking relationship that another major financial institution had already terminated under circumstances indicative of elevated fraud and compliance risk.  That history made BOA's failure to conduct enhanced scrutiny particularly unreasonable and made the resulting harm to investors especially foreseeable.

55.    BOA also understood the claimed business model:  To raise money from investors and use it to invest and make profits in cryptocurrency and return those deposits to investors.  Yet, BOA never saw profitable transactions in cryptocurrency anywhere sufficient to pay all the investors, if there were ever any profits.

56.    BOA, therefore, should have seen banking activity consistent with this business model.  That is, the banking activity should have reflected its receipt of investor funds for crypto investments, and then the bank should have seen profits from cryptocurrency trading come back into the account to pay investors.

57.    But that was not what BOA saw.  Instead, BOA saw a great deal of investor money deposits, inadequate deposits into cryptocurrency exchanges for investment, woefully insufficient cryptocurrency exchange deposits coming back necessary to pay investor profits, and an array of banking activity blatantly at odds with the claimed business model.

58.    BOA no doubt saw rapid movement of funds in and out of accounts.  Goliath diverted the money to pay lavish payments to its founder, Delgado, to promoters for commissions every month, and to investors, as well as debts of Goliath.  In other words, BOA knew it did not see profits from cryptocurrency transactions anywhere near what was needed to make all those fraudulent transfers to insiders and profit payments to investors.  Nonetheless, BOA ignored these blaring red flags for its own pecuniary gain.

14

59.    At times, funds deposited and intended for investment in Goliath were instead diverted to Delgado's personal account and to pay Delgado's personal expenses.

60.    The volume of funds passing through Goliath's account reflected a material disparity between what BOA expected from the operation of the business and Delgado's and Goliath's use of the account.

61.    The account activity was rife with wire fraud and money laundering, no doubt generating many alerts to bank employees, and eventually, SARs that BOA was required to file with the federal government.

62.    BOA observed and actively participated in banking behavior that contradicted the stated operation and actively assisted the misappropriation and siphoning of funds by Goliath and Delgado.  BOA knew that such actions with Goliath's funds were improper and harming Goliath and its investors.

63.    Goliath and Delgado's improper use of the accounts was apparent.  Yet, BOA facilitated this use through countless transactions involving tens of millions of dollars.

64.    All of this goes to show that BOA had *actual knowledge* of Goliath's Ponzi scheme and substantially assisted Goliath by refusing to close the account and lending the reputation of BOA to Goliath such that unsuspecting investors let their guard down when they believed that BOA would have stopped a Ponzi scheme from taking place.

## II.    THE GOLIATH VENTURES PONZI SCHEME

65.    Goliath promoted cryptocurrency investments promising consistent profits.

66.    Investors were told that their funds would be used in digital-asset trading strategies.

67.    In reality, the operation functioned as a Ponzi scheme.

68.    New investor funds were used to pay earlier investors.

69.    The scheme depended on constant inflows of new capital.

70.    When investor inflows slowed and outflows increased, the scheme collapsed.

71.     Goliath did not generate legitimate profits sufficient to sustain the returns

it promised to investors.  Instead, purported "returns" were funded primarily, if not entirely, through incoming investor deposits.

72.     The operation lacked any consistent or verifiable revenue-generating activity.  Although Goliath claimed to engage in cryptocurrency trading strategies, the flow of funds through its accounts did not reflect profitable trading activity capable of supporting investor payouts.

73.     From approximately May 2025 through September 2025 alone, approximately $75 million in investor funds was deposited into Goliath-controlled accounts at BOA, while approximately $11 million was paid out to investors as purported returns, funds that originated from other investor deposits rather than investment profits.

74.     During the same period, approximately $42 million was transferred to cryptocurrency exchange accounts.  However, the volume, timing, and structure of these transfers were inconsistent with any legitimate trading strategy and did not result in corresponding returns sufficient to fund investor payouts.

75.     Rather than operating as a legitimate investment vehicle, Goliath functioned as a cash-flow recycling mechanism, in which investor funds were pooled, commingled, and redistributed to create the false appearance of profitability and stability.

76.     The structure of the scheme required continuous access to the banking system to receive new investor deposits and to distribute funds to existing investors.  Without this continuous inflow of new capital, the scheme was destined to collapse.

77.     The mechanics of the scheme were not hidden or complex.  They were reflected directly in the pattern of deposits and withdrawals flowing through Goliath's bank accounts, making the fraudulent nature of the operation readily apparent to any financial institution monitoring the activity.

### III.   TRANSACTION-LEVEL RED FLAGS

78.     Large volumes of investor deposits entered Goliath's BOA account.

79.     These deposits occurred in rapid succession and were inconsistent with legitimate business operations.

16

80.    Investor deposits were commingled in common operating account(s).

81.    Transfers frequently occurred in round-number amounts.

82.    Deposits were quickly followed by outgoing payments—not to the cryptocurrency exchanges but instead to previous investors—believed to be labeled by Goliath as investor profits.

83.    The velocity of transfers was inconsistent with any legitimate cryptocurrency trading strategy.

84.    Accounts displayed circular payment patterns typical of Ponzi schemes.

85.    BOA observed repeated cycles in which new deposits were redistributed within short periods of time.

86.    The pattern that BOA saw was that little money going into the accounts came from profits of cryptocurrency trading.  Instead, BOA saw a great deal of investor money/investments entering the Goliath accounts and an array of banking activities blatantly at odds with the claimed business model.  BOA saw rapid movement of investment funds through accounts, believed to occur sometimes on the same day.  BOA saw the diversion of investor money to cover lavish payments to Delgado and payments to earlier investors.  The account activity was rife with wire fraud and money laundering, which under normal circumstances would trigger alerts.  Additionally, despite the lack of profits, BOA saw new investor funds being used to pay false returns to other investors.

87.    From May 2025 through September 2025, approximately $11 million from the BOA 9136 account was sent to investors purportedly as returns on investments. These funds primarily originated from funds held in the BOA 9136 account that investors sent to Goliath for investing purposes and were not returns from any investment activity.

88.    Thus, each time the  BOA employee(s) who saw how Goliath was moving money between investors, Goliath, crypto accounts, and Christoper Delgado, the pattern of misuse of Goliath investors' money was readily apparent and known.

89.    Despite this knowledge, BOA substantially assisted Goliath allowing and actively enabling the continued operation of BOA accounts, commingle investor funds,

17

diversion of monies to Delgado, and made the transfers necessary to perpetuate the scheme.

90.    With its goal to maximize assets held under management, account and transfer-related revenue, and compensation, BOA and its employees actively accommodated Goliath's pattern of misuse and misappropriation and went well beyond providing ordinary banking services.

91.    The scale of activity alone constituted a red flag.  Over a period of just a few months, tens of millions of dollars flowed through Goliath's BOA accounts, including approximately $75 million in incoming deposits, volumes that were inconsistent with any legitimate startup or investment operation lacking a verifiable track record.

92.    These deposits were frequently followed by rapid outbound transfers occurring within hours or days, reflecting a pattern of high-velocity fund movement that is commonly associated with fraud, layering, and money laundering activity.

93.    BOA also observed that purported investor "returns" were not supported by corresponding inbound revenue from cryptocurrency trading or other legitimate sources but instead were funded through newly deposited investor funds.

94.    The disparity between funds sent to cryptocurrency exchanges and funds returned from those exchanges was itself a glaring red flag.  While tens of millions of dollars were transferred out of the accounts, there were no corresponding inflows of trading profits sufficient to sustain investor payouts.

95.    In addition to investor-related transactions, BOA observed transfers of substantial funds for personal use, including large payments benefiting Delgado, which were inconsistent with the stated purpose of the accounts and indicative of misappropriation.

96.    The transaction activity reflected no coherent or legitimate business model. Instead, it consisted of repetitive inflows of investor funds followed by redistributions to insiders and other investors, with no identifiable economic purpose beyond sustaining the scheme.

97.    The combination of volume, velocity, circularity, and lack of legitimate revenue rendered the fraudulent nature of the activity unmistakable to any financial

18

institution exercising even minimal oversight, let alone a sophisticated institution such as BOA.

98.     Taken together, the transaction-level activity did not merely suggest the possibility of fraud.  It affirmatively demonstrated it.

## IV.   CRYPTO-EXCHANGE FLOW ALLEGATIONS

99.     Goliath represented to investors that their funds would be deployed in cryptocurrency trading strategies through established digital asset platforms, including accounts maintained at Coinbase.

100.     Consistent with these representations, BOA observed transfers from Goliath-controlled accounts to cryptocurrency exchanges, including Coinbase accounts associated with Goliath.

101.     From approximately May 2025 through September 2025, approximately $42 million was transferred from Goliath's BOA accounts to cryptocurrency exchange accounts.

102.     However, the volume, timing, and structure of these transfers were inconsistent with any legitimate cryptocurrency trading operation.

103.     A legitimate cryptocurrency investment business would be expected to generate corresponding inflows of trading profits from exchange platforms back into the operating accounts.  BOA, however, did not observe inflows of funds from cryptocurrency exchanges sufficient to support the volume of investor payouts being made.

104.     Instead, BOA observed a fundamental mismatch between:

    a.   The amount of investor money entering the accounts;

    b.   The amount purportedly invested in cryptocurrency; and,

    c.   The amount required to sustain the "returns" paid to investors.

105.     This mismatch was a clear indicator that investor funds were not being used in a profit-generating trading strategy, but rather were being recycled to fund payments to other investors.

106.     Further, the timing of transfers to cryptocurrency exchanges did not align

with any rational or consistent trading strategy. Transfers occurred in irregular amounts and were not tied to identifiable market activity, trading cycles, or risk management practices.

107. BOA also observed that funds transferred to cryptocurrency exchanges were not returned in a manner consistent with profitable trading. The absence of corresponding inbound transfers of trading gains was itself a red flag indicating that the purported investment strategy was not generating returns.

108. Instead of receiving legitimate trading profits, BOA observed that investor payouts were funded primarily through newly deposited investor funds, rather than through proceeds from cryptocurrency transactions.

109. The cryptocurrency exchange activity thus functioned, at most, as a partial conduit for investor funds rather than as a bona fide investment mechanism.

110. The limited and inconsistent flow of funds to and from cryptocurrency exchanges, when compared to the overall volume of investor deposits and investor payouts, made clear that Goliath's claimed business model was not legitimate.

111. These discrepancies were readily apparent from the transaction data available to BOA and constituted additional red flags requiring investigation and intervention.

112. Despite these clear indicators, BOA continued to process transfers to and from cryptocurrency exchanges and allowed the accounts to remain active, thereby enabling Goliath to perpetuate its scheme.

## V. WHY BOA COULD NOT HAVE MISSED THE FRAUD

113. The fraudulent nature of the Goliath scheme was not hidden, subtle, or difficult to detect. It was reflected directly in the structure, volume, and flow of transactions moving through Goliath's BOA accounts.

114. BOA had continuous, real-time access to detailed account activity, including the source, destination, timing, and amounts of all deposits and transfers. Through its monitoring systems, compliance programs, and personnel, BOA was uniquely positioned to identify suspicious patterns of activity.

115. The activity in Goliath's accounts exhibited numerous, overlapping, and persistent red flags associated with fraud and money laundering, including:

    a. Massive inflows of investor funds;

    b. Rapid and repetitive outbound transfers;

    c. Commingling of funds;

    d. Circular payment patterns;

    e. Payment to investors unsupported by legitimate revenue; and,

    f. Transfers for personal expenditures inconsistent with the stated business purpose.

116. These red flags did not occur in isolation. They occurred simultaneously, repeatedly, and at scale, reinforcing one another and eliminating any plausible benign explanation for the account activity.

117. BOA also understood Goliath's purported business model: to generate profits through cryptocurrency trading and return those profits to investors. Yet the transaction activity it observed was fundamentally inconsistent with that model.

118. Specifically, BOA observed substantial investor deposits without corresponding inflows of trading profits, and investor payouts that were funded by new deposits rather than legitimate earnings.

119. This disconnect between the claimed business model and actual account activity is a hallmark of a Ponzi scheme and would have been readily apparent to any financial institution exercising reasonable diligence.

120. BOA's own anti-money laundering systems were designed to detect precisely these types of anomalies. The volume, velocity, and structure of the transactions would have triggered alerts requiring review, escalation, and investigation.

121. Upon information and belief, the activity in Goliath's accounts generated multiple internal alerts within BOA's monitoring systems and required review by compliance personnel.

122. In addition, BOA's customer due diligence obligations required it to

understand the nature and purpose of Goliath's business and to compare expected account activity with actual transaction patterns.  The divergence between expectation and reality was stark and persistent.

123.   Further heightening the risk, Goliath had previously been debanked by another major financial institution, a fact that, upon information and belief, was known to or readily discoverable by BOA and required enhanced scrutiny.

124.   Rather than exercising such scrutiny, BOA ignored or recklessly disregarded these warning signs and continued to provide Goliath with unrestricted access to the banking system.

125.   BOA processed tens of millions of dollars in transactions through Goliath's accounts, including approximately $75 million in investor deposits, while the fraudulent nature of the activity was evident from the transaction patterns themselves.

126.   The misconduct was not a close call.  The convergence of red flags, the absence of legitimate revenue, the recycling of investor funds, and the diversion of funds for personal use made the fraudulent scheme unmistakable.

127.   Under these circumstances, BOA either had actual knowledge of the Goliath Ponzi scheme or was willfully blind to it.

128.   By continuing to maintain Goliath's accounts, process its transactions, and provide it with access to the banking system despite these obvious indicators of fraud, BOA enabled the scheme to operate, expand, and inflict substantial harm on investors.

**VI.   THE SCHEME COULD NOT HAVE CONTINUED WITHOUT BOA**

129.   The Goliath Ponzi scheme depended on continuous access to the U.S. banking system to receive investor funds, transfer those funds, and distribute purported returns.

130.   BOA provided the essential banking infrastructure that enabled Goliath to operate at scale, including maintaining accounts that served as the primary repository for investor deposits and the central hub for outgoing transfers.

131.   Through these accounts, BOA processed approximately $75 million in

investor deposits over a period of just a few months, providing Goliath with the ability to aggregate and control large volumes of investor capital.

132.   BOA also facilitated the transfer of approximately $42 million to cryptocurrency exchange accounts, enabling Goliath to create the appearance of legitimate investment activity.

133.   In addition, BOA processed approximately $11 million in payments to investors as purported returns, which were necessary to sustain the illusion of profitability and to induce additional investments.

134.   These banking services were not incidental, they were indispensable to the operation of the scheme.  Without a functioning bank account capable of receiving deposits and executing transfers, Goliath could not have accepted investor funds or redistributed those funds to perpetuate the scheme.

135.   Access to BOA's accounts also conferred legitimacy on Goliath's operations. Investors reasonably relied on the involvement of a major U.S. financial institution as an implicit assurance that the enterprise was subject to oversight and not engaged in fraudulent activity.

136.   By maintaining Goliath's accounts and continuing to process transactions despite obvious red flags, BOA enabled Goliath to continue soliciting funds from new investors and to expand the scope of its operations.

137.   BOA's role was particularly critical after Goliath had been debanked by another major financial institution.  By stepping in and providing continued access to the banking system, BOA allowed the scheme to persist and grow when it otherwise would have been significantly disrupted or halted.

138.   During the period in which BOA maintained and serviced Goliath accounts, the scheme had already entered an advanced stage characterized by escalating withdrawal pressures, capital shortfalls, and reliance on new investor deposits to sustain operations. BOA's continued servicing materially contributed to the continuation and expansion of investor losses.

139. Had BOA fulfilled its obligations and restricted, suspended, or terminated Goliath's accounts when the fraudulent activity became apparent, the scheme would have been unable to continue in its existing form and investor losses would have been substantially reduced.

140. Instead, BOA continued to provide uninterrupted banking services, allowing the scheme to operate for months and facilitating the continued movement of tens of millions of dollars.

141. BOA's conduct was therefore a substantial factor in causing Plaintiff's and the Class's losses and was a necessary condition for the continuation and expansion of the Goliath Ponzi scheme.

142. By continuing to provide banking services after numerous indicia of suspicious activity had arisen, BOA enabled the scheme to attract additional investor funds and prolonged its operational lifespan, thereby increasing the magnitude of losses suffered by investors whose funds were transmitted through BOA accounts.

## CLASS ACTION ALLEGATIONS

143. Plaintiff brings this action individually and on behalf of a class of similarly situated persons pursuant to Rule 23 of the Federal Rules of Civil Procedure.

144. Plaintiff seeks to represent a nationwide class defined as: All persons whose investment funds were transmitted to, deposited into, or routed through Bank of America accounts maintained for or used by Goliath Ventures during the Class Period.

145. Excluded from the class definitions are 1) Defendant and any of its current or former officers, directors, employees, agents, or representatives; 2) any judge or magistrate assigned to this action, members of their staff, and any members of their immediate families; and 3) any person or entity whose total withdrawals, redemptions, or payments from the Goliath investment program exceeded the total amount of that person or entity's invested principal (*i.e.*, "net winners").

146. The claims asserted herein are institution-specific and arise from BOA's unique banking relationship with Goliath Ventures during a distinct phase of the fraudulent

scheme. The conduct, transaction flows, knowledge indicators, and loss causation issues relevant to BOA differ materially from those applicable to other financial institutions.

147.   Plaintiff reserves the right to modify or amend the Class definition as discovery and further investigation may warrant.

### A.  Numerosity

148.   The members of the proposed Class are so numerous that joinder of all members is impracticable.

149.   Public filings in the criminal case against Christopher Delgado and related investigative materials indicate that Goliath raised hundreds of millions of dollars from thousands of investors across multiple jurisdictions.

150.   The identities of many Class members are presently known only to Defendants and third-party custodians, including financial institutions and self-directed IRA custodians that processed investor funds.

151.   Given the substantial number of investors and the geographic dispersion of those investors, joinder of all Class members would be impracticable.

152.   Membership in the Class can be determined through objective transactional evidence, including BOA account records, wire transfer documentation, investor payment histories, and related financial records reflecting the transmission of investor funds through the identified accounts.

### B.  Typicality

153.   Plaintiff's claims arise from the same legal theories and operative facts as those of the Class and are therefore typical of the claims asserted on behalf of the Class. Plaintiffs and each class member invested in Goliath Ventures Joint Venture Agreements and were subject to the wrongful conduct alleged in this Complaint.

154.   Plaintiff and Class members suffered losses as a result of the same course of conduct by Defendant.  Plaintiff's losses, like those of the Class, arise from Defendant's uniform conduct in facilitating the Goliath Ponzi scheme.

## C. Adequacy of Representation

155.   Plaintiff will fairly and adequately represent and protect the interests of the Class.

156.   Plaintiff's interests are aligned with those of the Class in seeking recovery for losses arising from the Goliath scheme.  Plaintiff has no interests antagonistic to those of the Class and is not subject to any unique defenses that would impair Plaintiff's ability to represent the Class fairly and adequately.  Plaintiff understands the obligations of a class representative and is prepared to fulfill those duties, including participating in discovery, appearing for deposition or trial if necessary, and acting in the best interests of the Class.

157.   Proposed Class Counsel are experienced in prosecuting complex litigation, class actions, and financial fraud matters and have the resources necessary to litigate this action vigorously through trial.  Proposed Class Counsel have extensive experience investigating and prosecuting investment-related misconduct and have devoted substantial time and resources to investigating the Goliath investment scheme.

158.   Indeed, prior to the arrest and charging of Goliath's principal, Delgado, Proposed Class Counsel had already filed some of the first civil actions arising from the Goliath scheme on behalf of injured investors.  Proposed Class Counsel were also the only lawyers to successfully seek the appointment of a receiver to protect remaining assets and preserve potential recoveries for investors.

159.   In addition, Proposed Class Counsel have engaged in extensive investigation of the Goliath scheme, including communications with hundreds of victims and analysis of the investment structure used to solicit investor funds.  Based on that investigation, Proposed Class Counsel are organizing claims not only against the primary wrongdoers but also against third parties that enabled the scheme, including Defendant.

160.   Through these efforts, Proposed Class Counsel have developed substantial knowledge concerning the Goliath enterprise, the role played by its professional advisors, and the damages suffered by investors.  Proposed Class Counsel have committed and will continue to commit the resources necessary to prosecute this action and obtain the best

possible recovery for the Class.

161. Accordingly, Plaintiff and Proposed Class Counsel will fairly and adequately represent and protect the interests of the Class.

**D. Commonality and Predominance**

162. Common questions of fact and law exist as to all members of the Class and predominate over any questions affecting only individual Class members. Among the questions common to the Class are:

    a. Whether Goliath and its principals operated a Ponzi scheme and/or otherwise engaged in fraud, breach of fiduciary duty, and misappropriation of investor funds;

    b. Whether BOA aided and abetted, knowingly participated in, or substantially assisted Goliath's fraudulent scheme and related misconduct;

    c. Whether BOA knowingly disregarded atypical banking activity and other red flags indicating that Goliath was engaged in investor fraud, breach of fiduciary duties, and/or misappropriation of investor funds;

    d. Whether BOA had actual knowledge, or was willfully blind to the fact, that Goliath was operating a fraudulent investment scheme;

    e. Whether BOA's continued provision of banking services to Goliath, in the face of mounting red flags, constituted negligence and/or gross negligence;

    f. Whether BOA violated applicable statutory and common law duties, including duties arising under anti-money laundering and banking compliance obligations; and,

    g. Whether, as a result of the foregoing conduct, Plaintiff and members of the Class are entitled to damages, restitution, and other relief.

163. These questions are capable of common proof and will generate common answers that drive the resolution of this litigation.

164. Common questions of law and fact predominate over any questions affecting only individual Class members because BOA's liability arises from a uniform

course of conduct directed at a single fraudulent enterprise, Goliath, implemented through standardized banking policies, procedures, and systems applied uniformly across all Goliath accounts.

165.    This action presents core, class-wide questions concerning BOA's role in enabling, facilitating, and substantially assisting the Goliath Ponzi scheme.  Those questions arise from a single body of conduct, including: BOA's onboarding of Goliath as a banking customer; its Know Your Customer and due diligence processes; its ongoing maintenance of Goliath's accounts; its processing of tens of millions of dollars in investor deposits and outbound transfers; and its failure to investigate, report, restrict, or terminate those accounts despite the accumulation of obvious and escalating red flags.

166.    BOA's conduct did not involve individualized decisions directed toward particular investors.  Rather, BOA serviced a single fraudulent enterprise through a defined set of accounts, and the scheme operated through those accounts in a uniform and repetitive manner.  Each investor's funds were transmitted into the same banking infrastructure, commingled within the same accounts, and redistributed through the same transactional patterns under the same systemic failures of monitoring, compliance, and intervention.

167.    The central liability issues therefore concern BOA's own institutional conduct, including: its onboarding and risk assessment of Goliath; the design and operation of its transaction monitoring systems; the alerts generated—or ignored—by those systems; its compliance with BSA and anti-money laundering obligations; its internal decision-making regarding whether to continue servicing Goliath; and the nature and extent of its knowledge of the fraudulent scheme.  Resolution of these issues will depend on common evidence, including BOA's internal account records, compliance policies and procedures, transaction monitoring outputs, Suspicious Activity Report practices, internal communications, and testimony concerning institutional knowledge and decision-making.

168.    Because BOA's alleged misconduct consists of its uniform provision of banking services to a single fraudulent enterprise, the determination of liability—whether for aiding and abetting fraud, aiding and abetting breach of fiduciary duty, negligence, or related

28

claims—will turn on evidence common to the Class rather than individualized proof. The same transactions, the same red flags, the same monitoring failures, and the same institutional decisions that give rise to liability as to one investor apply equally to all.

169.    The core issues driving this litigation—including whether BOA's systems detected or should have detected hallmarks of Ponzi activity; whether BOA had actual or constructive knowledge of the fraud; whether it substantially assisted the scheme by continuing to provide essential banking services; and whether its conduct violated applicable law—are all susceptible to common, class-wide proof. None of these issues depends on any individual investor's interactions with BOA or knowledge of the scheme.

170.    Any individualized issues that may arise relate primarily to the calculation of damages and do not defeat predominance. Class members' losses can be determined through objective financial records reflecting deposits into and withdrawals from the Goliath scheme, without individualized inquiry into BOA's conduct. Because damages flow from a common fraudulent scheme enabled by BOA's uniform conduct, individualized damages issues do not predominate.

171.    Accordingly, the central liability questions in this action—whether BOA knowingly or recklessly disregarded red flags of fraud, whether it substantially assisted the scheme by providing indispensable banking infrastructure, and whether its conduct caused the losses suffered by Plaintiff and the Class—can be resolved through common proof applicable to the Class as a whole. Class treatment is therefore appropriate and warranted.

**E. Superiority**

172.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Although each class member paid at least thousands of dollars to invest in the relevant Goliath Joint Venture Agreements, the cost of litigation will be high. The factual issues in this case are complex and detailed, extended over several years, and relate to many transactions. Absent a class action, most members of the class would likely find the cost of litigating their claims individually to be prohibitively high and would have no effective remedy.

173.    Class treatment of common questions of law and fact is a superior method to piecemeal litigation because class treatment will conserve the resources of the courts and will promote efficiency of adjudication.  Class treatment will avoid the substantial risk of inconsistent factual and legal determinations of the issues in this lawsuit.

174.    All conditions precedent to this action were performed, waived, or excused.

## CLAIMS FOR RELIEF

## CLAIM 1: AIDING & ABETTING FRAUD

175.    Plaintiff repeats and realleges paragraphs 1–174 as if fully set forth herein.

176.    Goliath Ventures, its principals, and related actors (the "Goliath Operators") engaged in a fraudulent scheme, including material misrepresentations and omissions concerning the nature, safety, and profitability of the purported investment program, and misappropriated investor funds.

177.    Plaintiff and members of the Class reasonably relied on those misrepresentations and omissions in transferring funds to Goliath and suffered substantial losses as a result.

178.    BOA had actual knowledge of Goliath's cryptocurrency Ponzi scheme.

179.    BOA had actual knowledge of the fraud as demonstrated by the numerous, obvious, and repeated red flags reflected in the Goliath accounts, including but not limited to atypical transaction patterns, rapid inflows and outflows, commingling of investor funds, and transactions inconsistent with any legitimate business purpose.

180.    The nature and scale of the suspicious activity eliminated any possibility that BOA was merely negligent or unaware.  The repeated, high-volume, and internally inconsistent transaction patterns—combined with the absence of legitimate revenue—were so pervasive that they could only be understood as indicative of fraud by any reasonable financial institution.

181.    BOA's knowledge of the fraud is further supported by the fact that, upon

information and belief, Goliath had already been debanked by JPMorgan Chase before BOA opened and maintained the Goliath accounts. The prior termination of Goliath's banking relationship by another major financial institution constituted a material warning sign that Goliath presented elevated fraud, compliance, and money-laundering risk.

182.    Despite this knowledge, BOA knowingly provided substantial assistance to the Goliath Operators by maintaining and servicing the accounts through which the fraudulent scheme operated.

183.    By onboarding Goliath despite JPMorgan's prior debanking decision, BOA supplied critical banking access that allowed the scheme to continue after another major bank had already exited the relationship.  BOA thus did not merely fail to detect fraud; it affirmatively enabled the continuation of a previously flagged enterprise.

184.    BOA's role was not limited to routine banking services.  By repeatedly executing, clearing, and settling transactions that it knew or should have known were part of a fraudulent scheme, BOA provided the essential financial infrastructure that allowed the scheme to function, thereby transforming ordinary banking services into substantial assistance.

185.    BOA knowingly and substantially assisted Goliath and Delgado in unlawfully defrauding Plaintiff and the class, in at least the following respects:

    a.  Accepting and processing millions of dollars in investor deposits into Goliath-controlled accounts;

    b.  Permitting the commingling of investor funds within those accounts;

    c.  Executing high-volume, rapid, and circular transfers characteristic of Ponzi activity, including payments to earlier investors funded by new investor deposits;

    d.  Facilitating transfers to cryptocurrency exchanges and other third-party accounts to further conceal and perpetuate the scheme;

    e.  Continuing to provide uninterrupted banking services despite the accumulation of red flags indicating fraudulent activity;

  f. Failing to implement, follow, or enforce adequate anti-money laundering and transaction monitoring protocols;

  g. Failing to investigate, restrict, suspend, or terminate Goliath's accounts despite clear indicators of fraud;

  h. Failing to report suspicious activity or otherwise take corrective action to prevent the ongoing misappropriation of investor funds; and,

  i. Onboarding and continuing to bank Goliath despite the prior termination of Goliath's banking relationship with JPMorgan Chase, a circumstance that required heightened scrutiny and strongly indicated elevated fraud risk.

186. BOA's assistance was a substantial factor in enabling the Goliath scheme to operate, expand, and continue over time.

187. But for BOA's continued provision of banking services—including its decision to onboard Goliath after it had been debanked elsewhere and to maintain those accounts despite mounting red flags—the Goliath scheme would have been unable to accept investor funds, recycle those funds, or continue operating in the manner alleged herein.

188. BOA was aware of its role in facilitating the scheme and acted knowingly or with conscious disregard of the fraudulent conduct.

189. BOA derived substantial benefits from its participation in the scheme, including fees, account balances, and other economic advantages associated with servicing high-volume accounts.

190. As a direct and proximate result of BOA's aiding and abetting of fraud, Plaintiff and members of the Class suffered damages in an amount to be determined at trial.

**CLAIM 2: AIDING & ABETTING BREACH OF FIDUCIARY DUTY**

191. Plaintiff repeats and realleges paragraphs 1–174 as if fully set forth herein.

192. At all relevant times, Goliath Ventures and its principal, Delgado, exercised discretionary authority and control over investor funds contributed pursuant to the Goliath investment program.

193. Delgado held himself out as the President, Chief Executive Officer, and

32

controlling decisionmaker of Goliath and maintained complete or substantially complete control over Goliath's operations, including the custody, management, and disposition of investor funds deposited into accounts maintained at BOA.

194.    By virtue of their roles as joint venture partners, investment managers, and de facto custodians of investor assets, Goliath and Delgado owed fiduciary duties to Plaintiff and members of the Class, including duties of loyalty, care, full disclosure, and the obligation to act in good faith and in the best interests of investors.

195.    Those fiduciary duties arose, *inter alia*, from: (a) the Joint Venture Agreements designating investors as partners in a shared enterprise; (b) Goliath's discretionary control over pooled investor funds; and (c) Goliath's role as a cryptocurrency investment manager, commodity pool operator, and/or financial advisor.

196.    Goliath and Delgado breached these fiduciary duties by, among other things, misappropriating investor funds, commingling assets, using new investor deposits to satisfy redemption requests from earlier investors, and diverting funds for unauthorized purposes unrelated to any legitimate investment strategy.

197.    BOA had actual knowledge, or at a minimum was willfully blind to the fact, that Goliath and Delgado were breaching their fiduciary duties to investors.  This knowledge is evidenced by, among other things, the highly irregular and suspicious transaction patterns occurring across Goliath-controlled accounts, including large-volume inflows from numerous unrelated investors, rapid internal transfers, and outbound payments inconsistent with any legitimate investment activity.

198.    BOA's knowledge was further reinforced by the fact that Goliath had previously been debanked by JPMorgan Chase. A reasonable financial institution handling pooled investor funds would have understood such prior debanking to be a serious indicator that investor assets were at risk of misuse, commingling, or misappropriation.

199.    BOA also knew that Goliath was operating as an unlicensed cryptocurrency investment enterprise handling pooled investor funds in a high-risk and heavily scrutinized sector, triggering heightened compliance, monitoring, and reporting obligations.

200.    BOA also understood that Goliath's control over pooled investor funds placed those funds in a custodial or quasi-custodial relationship, heightening the risk of misuse. Despite this, BOA facilitated transactions that directly enabled the diversion and redistribution of investor funds in breach of those fiduciary obligations.

201.    Notwithstanding this knowledge, BOA knowingly and substantially assisted Goliath and Delgado in breaching their fiduciary duties by, among other things:

    a.  Opening, maintaining, and servicing accounts used to receive and transfer investor funds derived from the Goliath investment program;

    b.  Facilitating the commingling of investor funds across multiple accounts without regard to ownership or purpose;

    c.  Processing and executing a continuous flow of transactions that bore the hallmarks of a Ponzi scheme, including payments to earlier investors funded by new investor deposits;

    d.  Ignoring or overriding internal alerts, compliance warnings, and other red flags indicative of fraud and fiduciary misconduct;

    e.  Failing to conduct adequate due diligence, enhanced monitoring, or investigation despite clear indicators of suspicious and unlawful activity;

    f.  Continuing to provide banking services to Goliath and Delgado after the existence of significant compliance red flags demonstrating misuse of investor funds; and,

    g.  Failing to take reasonable steps to prevent, report, or mitigate the ongoing misappropriation of investor assets.

202.    By choosing to open and maintain accounts for Goliath after another major bank had already terminated its relationship with Goliath, BOA materially assisted Delgado and Goliath in continuing to exercise wrongful control over investor funds and in prolonging their breaches of fiduciary duty.

203.    BOA's assistance was a substantial factor in enabling Goliath and Delgado to carry out and prolong their breaches of fiduciary duty, as the scheme depended on

34

uninterrupted access to the banking system to receive, transfer, and dissipate investor funds.

204.     As a direct and proximate result of BOA's aiding and abetting of these breaches of fiduciary duty, Plaintiff and members of the Class have suffered substantial financial losses in an amount to be determined at trial.

## CLAIM 3: UNJUST ENRICHMENT

205.     Plaintiff repeats and realleges paragraphs 1–174 as if fully set forth herein.

206.     As a direct and proximate result of its provision of banking services to Goliath Ventures and Delgado, BOA received and retained substantial economic benefits, including but not limited to account maintenance fees, wire transfer fees, ACH processing fees, transaction-based charges, and float income generated from the continuous movement and retention of investor funds.

207.     These benefits were derived directly from funds contributed by Plaintiff and members of the Class. But for the deposits of investor funds into the Goliath-controlled accounts, the transaction volume and account activity generating BOA's revenue would not have existed.

208.     BOA accepted and retained these benefits with actual knowledge, or at a minimum conscious disregard and willful blindness, that the funds flowing through the Goliath accounts were investor funds being misappropriated in connection with a fraudulent investment scheme.

209.     The inequity of BOA's retention of these benefits is heightened by the fact that BOA accepted and profited from a banking relationship that, upon information and belief, JPMorgan Chase had already terminated due to suspicious or high-risk activity.  BOA thus earned fees and other benefits from servicing an enterprise that had already presented sufficient risk to cause another major financial institution to exit the relationship.

210.     Under these circumstances, BOA's retention of the fees, charges, and other financial benefits derived from the Goliath accounts is inequitable and unjust, as those benefits were obtained through the exploitation and misuse of investor assets.

211.     Plaintiff and members of the Class did not knowingly or voluntarily confer

35

any benefit upon BOA under circumstances that would render its retention of such benefits equitable. To the contrary, any benefit conferred was the direct product of fraud and misconduct.

212. Equity and good conscience require that BOA disgorge and return all fees, revenues, and other economic benefits it received in connection with the Goliath accounts, together with appropriate equitable relief, in an amount to be determined at trial.

## CLAIM 4: NEGLIGENCE

213. Plaintiff repeats and realleges paragraphs 1–174 as if fully set forth herein.

214. At all relevant times, BOA knew or should have known that Goliath Ventures was soliciting, receiving, and controlling funds from numerous investors for the purported purpose of cryptocurrency investment and trading.

215. By virtue of its role in opening, maintaining, and servicing the accounts through which investor funds were deposited, transferred, and disbursed, BOA owed Plaintiff and members of the Class a duty to exercise reasonable care in monitoring account activity, detecting suspicious transactions, and preventing the misuse and misappropriation of investor funds.

216. This duty arose from, *inter alia*, BOA's knowledge that it was handling pooled investor funds, its obligations under applicable banking regulations and industry standards designed to detect and prevent fraud and money laundering, and the foreseeability that failure to act on clear warning signs would result in substantial harm to identifiable third-party investors.

217. That duty of reasonable care included an obligation to conduct adequate onboarding diligence into Goliath's prior banking history, including the circumstances under which JPMorgan Chase had terminated its relationship with Goliath. A reasonable bank would have treated such prior debanking as a significant risk factor requiring enhanced review, heightened monitoring, and prompt intervention.

218. BOA breached its duty of care by, among other things:

    a. Failing to implement and apply reasonable monitoring and oversight to

36

accounts receiving large volumes of investor funds;

b.  Ignoring or failing to investigate obvious discrepancies and irregularities in account activity, including rapid inflows from numerous unrelated investors followed by immediate outflows inconsistent with any legitimate investment strategy;

c.  Failing to identify, escalate, or respond to known compliance and regulatory "red flags," including internal alerts indicative of suspicious or potentially fraudulent conduct;

d.  Permitting the commingling and uncontrolled movement of investor funds across accounts without adequate safeguards or inquiry;

e.  Processing transactions that bore the hallmarks of a Ponzi scheme, including the use of new investor funds to pay earlier investors;

f.  Failing to conduct enhanced due diligence despite clear indicators that Goliath was operating as an unlicensed and high-risk cryptocurrency investment enterprise;

g.  Failing to report suspicious activity or otherwise take reasonable steps to prevent the ongoing misuse of investor funds;

h.  Continuing to provide uninterrupted banking services to Goliath and Delgado despite mounting evidence of fraudulent activity; and,

i.  Failing to investigate, account for, or respond appropriately to the prior termination of Goliath's banking relationship with JPMorgan Chase before onboarding Goliath and permitting it to resume large-scale movement of investor funds through BOA accounts.

219.  The risk of harm to investors was not abstract or speculative. It was immediate, concrete, and entirely foreseeable from the transaction data available to BOA. The continuation of high-volume investor inflows coupled with the absence of legitimate investment returns made investor losses not just possible, but inevitable absent intervention.

220.  BOA's failures constitute a departure from the standard of care applicable

to financial institutions under similar circumstances and amount to negligence, if not gross negligence and bad faith.

221. The harm suffered by Plaintiff and members of the Class was a direct and foreseeable consequence of BOA's breaches. The Goliath scheme depended on the continued operation of bank accounts to receive, transfer, and dissipate investor funds, and absent BOA's failures, the scheme could not have persisted in the manner alleged.

222. The economic loss rule does not bar Plaintiff's claims because BOA owed an independent duty of care to Plaintiff and the Class arising from its handling of investor funds and its role in facilitating financial transactions that directly affected identifiable third parties. Plaintiff and Class members had no contractual relationship with BOA and therefore seek recovery in tort.

223. As a direct and proximate result of BOA's negligence, Plaintiff and members of the Class have suffered substantial financial losses, including the loss of their invested principal, loss of use of their funds, and related damages, in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

224. WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, respectfully requests that the Court enter judgment in their favor and grant the following relief:

    a. Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative, and appoint Plaintiff's counsel as Class Counsel;

    b. Enter judgment in favor of Plaintiff and the Class and against Defendant on all claims asserted herein;

    c. Award compensatory damages in an amount to be determined at trial for all losses suffered by Plaintiff and members of the Class as a result of Defendant's wrongful conduct;

d.  Award consequential damages, including damages resulting from the loss of investment opportunity and the loss of the use of invested capital;

e.  Order disgorgement and restitution of all fees, compensation, and benefits Defendant received in connection with the structuring, documentation, or validation of the Goliath enterprise;

f.  Impose a constructive trust and order an equitable accounting for any funds, fees, or benefits wrongfully obtained by Defendant in connection with the Goliath enterprise;

g.  Award rescission or rescissory damages to restore Plaintiff and members of the Class to the financial position they would have occupied absent Defendant's misconduct;

h.  Grant equitable relief as necessary to remedy Defendant's misconduct and to restore Plaintiff and the Class to the financial position they would have occupied absent Defendant's wrongdoing;

i.  Award pre-judgment and post-judgment interest as permitted by law;

j.  Award Plaintiff and the Class their reasonable attorneys' fees, litigation costs, and expenses where permitted by law; and,

k.  Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial for any counts for which a trial by jury is permitted by law.

DATED this 19th day of March, 2026.

/s/ Margaret A. McLetchie
**MCLETCHIE LAW**
Margaret A. McLetchie
Nevada Bar No. 10931
Leo S. Wolpert
Nevada Bar No. 12658
602 South Tenth Street
Las Vegas, NV 89101

Telephone: (702) 728-5300;
Fax: (702) 425-8220
maggie@nvlitigation.com
leo@nvlitigation.com
efile@nvlitigation.com

**SHAW LEWENZ**
Jordan A. Shaw, Esq. (*pro hac vice* pending)
Florida Bar No. 111771
Gabriel E. Morales Esq.
(*pro hac vice* pending)
Florida Bar No. 1038778
110 S.E. 6th Street, Suite 2900
Ft. Lauderdale, FL 33301
Telephone: (954) 361-3633
Fax: (954) 989-7781

**SONN LAW GROUP PA**
Jeffrey R. Sonn, Esq.
Florida Bar No. 773514
(*pro hac vice* pending)
Brian Pastor, Esq.
Florida Bar No. 998826
19495 Biscayne Blvd Suite 607
Aventura, FL 33180
Telephone: 305-912-3000
Fax: 786-485-1510
Jsonn@sonnlaw.com
service@sonnlaw.com

**ADAM A. SCHWARTZBAUM, P.A.**
Adam A. Schwartzbaum, Esq. (*pro hac vice* pending)
Florida Bar No. 93014
14 NE 1st Ave Suite 705
Miami, FL 33132
Telephone: 305-725-1245
adam@schwartzbaum.com
admin@schwartzbaum.com

**Murphy's Law: The Crypto Law Firm**
T. Liam Murphy, Esq. (*pro hac vice* pending)
New York Bar No. 5853759
353 Lexington Avenue
4th Floor, Suite 400
New York, New York 10016

40

Telephone: 913-575-0540
liam@murphyslawcrypto.com
*Attorneys for Plaintiff*